UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF INDIANA, *ex rel* TOM HERRON and MELANIE ANDERSON, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | CASE NO. 1:06-cv-1778-JDT-WTL |
| INDIANAPOLIS NEUROSURGICAL GROUP, INC., MARK BRYNIARSKI, M.D., MICHAEL BURT, M.D., PATRICK CONNOLLY, M.D., DANIEL COOPER, M.D., ANDREW DENARDO, M.D., HENRY FEUER, M.D., PETER GIANARIS, M.D., JULIUS GOODMAN, M.D., DAVID HALL, M.D., TERRY HORNER, M.D., STEVEN JAMES, M.D., DEAN KARAHALIOS, M.D., SAAD KHAIRI, M.D., THOMAS LEIPZIG, M.D., ARMOND LEVY, M.D., NANCY LIPSON, M.D., KEVIN MACADAEG, M.D., JEAN-PIERRE MOBASSER, M.D., MICHAEL MORONE, M.D., DAN NORDMAN, M.D., TROY PAYNER, M.D., ERIC POTTS, M.D., DAVID RATZMAN, M.D., THOMAS REILLY, M.D., KENNETH RENKENS, M.D., CARL SARTORIUS, M.D., RICK SASSO, M.D., JOHN SCOTT, M.D., MICHAEL TURNER, M.D., DERRON WILSON, M.D., RONALD YOUNG, M.D., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | UNDER SEAL |
| Defendants. | ) ) ) | |

## AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiffs the United States of America and the State of Indiana, through Relators Tom

Herron and Melanie Anderson (the "Relators"), state as follows:

## STATEMENT OF THE CASE

1      This is an action to recover damages and civil penalties on behalf of the United States of America ("USA") and the State of Indiana ("State of Indiana") arising from false statements and claims made or caused to be made by Defendants to the USA in violation of the False Claims Act ("FCA"), as amended, at 31 U.S.C. § 3729 *et seq.*, and to the State of Indiana in violation of the Indiana False Claims and Whistleblower Protection Act (the "Indiana FCA") at Ind. Code § 5-11-5 5-1 *et seq.* This is also an action to recover damages and civil penalties for theft and conversion under Indiana law and to recover damages under common law theories of payment by mistake of fact, unjust enrichment, and fraud.

2.      The false statements and allegations of fraud described herein are brought by whistleblowers Tom Herron ("Herron") and Melanie Anderson ("Anderson") based on their personal knowledge and experience working for Defendant ING as Senior Coding Specialists. This suit is not based on any publicly disclosed information, and Herron and Anderson are the "original sources" of information within the meaning of 31 U.S.C. § 3730(e)(4).

3      Anderson resigned in 2006 due to increased pressure from ING to commit fraud. Herron, while deeply concerned about his possible complicity in such fraud, remained employed at ING as its only remaining coding specialist for the purpose of relating the allegations contained in this Complaint until his dismissal on November 12, 2007  Herron's assistance in this case, particularly in the gathering of evidence, raised suspicions and, on information and belief, resulted in termination.

4.      Herron and Anderson are coding experts; both are members of the American Academy of Professional Coders, where they each hold the titles of Certified Professional Coder and

General Surgery Specialist   They are also both members of the Professional Healthcare Institute of America where they each hold the title of Certified Coding Professional

5.   At all times relevant to this Complaint, Herron and Anderson were principally responsible for reviewing, confirming, and posting all claims submitted by ING for reimbursement to Medicare, Medicaid, TRICARE, and the VA (collectively referred to as the "Federal Insurers")

6.   It was in this capacity that Herron and Anderson learned of, and were in fact ordered to participate in, Defendants' company-wide scheme to defraud the government by knowingly and intentionally overcharging and submitting false claims for reimbursement with the Federal Insurers

7.   In the process of relating Defendants' pattern of fraud for this Complaint, Relators Herron and Anderson have identified no less than ten (10) separate fraudulent schemes which together have resulted in Defendants receiving millions of dollars from the Federal Insurers that otherwise would not have been paid.

8.   In total, Defendants have currently filed approximately 123,619[1] false claims for payment totaling over \$36,893,539 92[2] since on or about 1996.

9.   Specifically, Relators Herron and Anderson allege that for the last ten (10) years and continuing through the present, Defendants have systematically engaged in the following fraudulent schemes:

    a.   Falsely and intentionally billing for Evaluation and Management (E&M) services[3] utilizing higher paying CPT codes not justified under the CPT or Medicare and

---

[1] This figure was extrapolated by adding up the total number of encounters/transactions from each of the ten (10) fraudulent schemes detailed in the "Specific Allegations of Fraud" section of this Complaint  This total is an estimate based on information obtained by Relator Herron as an employee of ING  Herron has retrieved this information under extremely difficult circumstances –his email and keystrokes are being monitored and his access to certain types of reports has been prohibited entirely.  As a result, the information disclosed in this Complaint is the best information available to Herron at this time  Upon information and belief, however, the totals extrapolated in this Complaint are likely to be much higher upon further discovery of specific documents that Herron has been unable to obtain

[2] This figure was extrapolated by adding up the total number of dollars billed for each of the ten (10) fraudulent schemes detailed in the "Specific Allegations of Fraud" section of this Complaint  *See also* ftnt 1 *supra*

[3] E&M services refer to physician/patient encounters for assessment, counseling, and other services provided to a patient and reported through CPT codes  Such services include, but are not limited to, the following categories: new patients, established patients, initial hospital visits, subsequent hospital care, outpatient consultations, and initial patient consultations

Medicaid reimbursement regulations (hereinafter referred to as "upcoding") for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

b.   Falsely and intentionally billing for transcatheter permanent occlusion or embolization procedures utilizing the wrong, but higher paying, CPT code for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

c.   Falsely and intentionally billing for the baclofen test utilizing the wrong, but higher paying, CPT code for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

d.   Falsely and intentionally billing as if Defendants had performed the entire stereotactic radio frequency surgery when Defendants only performed a small portion of the procedure. Defendants nonetheless knowingly utilized a CPT code not justified under the CPT or Medicare and Medicaid reimbursement regulations for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

e.   Falsely and intentionally billing for assists at surgeries performed by certified surgical technicians ("CSTs") despite the fact that Medicare and Medicaid reimbursement regulations explicitly prohibit reimbursement. To evade this requirement, Defendants knowingly billed for services performed by CSTs utilizing physician provider numbers despite the fact that the CST rendered the service. This scheme was perpetrated for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

f.   Falsely and intentionally billing for services rendered by a non-physicians including registered nurses ("RNs"), physician assistants ("PAs"), nurse practitioners ("NPs") , x-ray technicians and manufacturer's representatives, utilizing the physician's provider number despite the fact that the non-physician rendered the service and the circumstances did not justify "incident to" billing under Medicare and Medicaid reimbursement regulations This scheme was perpetrated for the purpose of defrauding the Federal Insurers and inflating overall reimbursements

g.   Falsely and intentionally billing for services rendered by non-credentialed providers, e.g., PAs and NPs, prior to credentialization despite the fact that Medicare and Medicaid reimbursement regulations explicitly prohibit reimbursement without such credentialization. This scheme was perpetrated for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

h.   Falsely and intentionally billing for services rendered by students, residents, and fellows utilizing the physician's provider number despite the fact that Medicare and Medicaid is already reimbursing the educational institution for services rendered by these individuals. This double billing scheme was perpetrated for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

i.   Falsely and intentionally billing for services and medical treatment when the medical documentation either is nonexistent or insufficient to support the rendering of any

4

services on the date of the charge or to justify the CPT code utilized. This scheme was perpetrated for the purpose of defrauding the Federal Insurers and inflating overall reimbursements.

j.   Knowingly and intentionally failing to refund payments fraudulently received from Medicare and Medicaid upon discovery of over-billings. Defendants also failed to take corrective actions to prevent future over-billings.

k.   Falsely upcoding, overcharging, and billing for other medical treatment and/or services not expressly enumerated above

10    A memorandum setting forth all relevant material evidence and information in the possession of Herron and Anderson regarding the allegations of fraud described herein has been filed pursuant to 31 U.S.C. §§ 3730(e)(4)(B) and 3730(b)(2) and Ind. Code § 5-11-5 5-4(c)(2).

11    For each of the ten (10) fraudulent schemes identified above, Defendants were warned repeatedly that their practices violated Medicare and Medicaid reimbursement regulations In fact, both Relators Herron and Anderson personally warned Defendants through face-to-face interactions, written memorandums and "Coding Updates"

12.    In addition, Herron and Anderson reviewed all claims submitted by the Defendant physicians prior to posting those charges with the Federal Insurers. When the physicians utilized an incorrect CPT code or billed improperly, such errors were discovered and relayed to the offending physician along with the suggested revisions. In most cases, however, when confronted with an improper claim, the Defendant physicians instructed Herron and Anderson to post the claim as written despite the fact that it was false. Moreover, Herron and Anderson were frequently reprimanded for catching these improprieties and reporting them to the physicians

13.    The false claims at issue in this Complaint are not mere aberrations, but are rather indicative of an overwhelming pattern of fraud, knowingly perpetrated by the Defendants for the purpose of inflating overall reimbursements and stealing millions of dollars from the Federal Insurers for their own financial gain.

5

14.    Pursuant to both the FCA and the Indiana FCA, Plaintiffs seek to recover damages and civil penalties arising from these false and improper charges contained in claims for payment which Defendants submitted, or caused to be submitted, to the Federal Insurers.

## PARTIES

15    The USA is the plaintiff for whom recovery is sought for false and fraudulent claims submitted to the federal government by Defendants

16    The USA, acting through the Department of Defense, administers the Military Health System, including TRICARE ("TRICARE"), which is a regionally managed health care program for Active Duty, Activated Guard and Reserves, Retired members of the uniformed services, their families, and survivors. TRICARE brings together the health care resources of the Army, Navy and Air Force and supplements them with networks of civilian health care professionals to provide better access and high quality service while maintaining the capability to support military operations. Active Duty and Guard and Reserve service members are automatically enrolled in TRICARE Prime. However military dependents and retirees must choose the TRICARE option that best suits their needs

17    The USA, acting through the Department of Veterans Affairs, administers VA Health Care ("VA") primarily for veterans with service connected disabilities and for veterans who fall below a certain low-income threshold.

18.    The USA, acting through the Department of Health and Human Services, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq* ("Medicare") and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

19    Medicare is a federally-funded health insurance program primarily for the elderly Medicare was created in 1965 when Title XVIII of the Social Security Act was adopted. Medicare

has two parts: Part A, the Basic Plan of Hospital Insurance, which covers the cost of hospital services and related care; and Part B, which covers the cost of physicians' services and certain other medical services not covered by Part A.

20.     The State of Indiana is an additional plaintiff for whom recovery is sought for false and fraudulent claims submitted by Defendants to the state government  The State of Indiana, through the Office of Medicaid Policy and Planning, acting through the Indiana Family and Social Services Administration, is responsible for the administration of the Indiana Medicaid Program.

21     Medicaid was created at the same time as Medicare in 1965 when Title XIX was added to the Social Security Act. Medicaid is a public assistance program to provide payment of medical expenses for low-income patients  Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Medicaid coverage for diagnostic test services is generally modeled after Medicare's coverage.

22.     Plaintiff and Relator Herron, who brings this action under the FCA and the Indiana FCA to recover treble damages and civil penalties on behalf of the USA and the State of Indiana, is a citizen and a resident of the State of Indiana.  Herron has been a certified coder for eight (8) years. Herron worked for Defendant Indianapolis Neurosurgical Group, Inc. ("ING") for the last five (5) years until his dismissal  At ING, Herron held the position of Senior Coding Specialist.

23.     Plaintiff and Relator Anderson, who brings this action under the FCA and the Indiana FCA to recover treble damages and civil penalties on behalf of the USA and the State of Indiana, is a citizen and a resident of the State of Indiana.  Anderson has been working in medical coding and billing for fifteen (15) years.  Anderson worked for ING from 2001 through 2006 where she worked with Herron as a Senior Coding Specialist

24     Relators Herron and Anderson bring this action on behalf of themselves, the USA, and the State of Indiana pursuant to 31 U.S.C. § 3730(b)(1) and Ind Code § 5-11-5.5-1 *et seq.*

7

Relators have knowledge of the false statements and/or claims that Defendants submitted, or caused to be submitted, to the government as alleged herein.

25.     Defendant ING is a for-profit domestic corporation organized under the laws of the State of Indiana and authorized to conduct business in the State of Indiana. Founded in 1970, ING is a nationally recognized neurosurgical practice with a staff of over one hundred persons. ING claims to have performed more than 150,000 neurosurgical consultations and built a reputation as one of the largest and most progressive neurosurgical practices in North America. With multiple locations throughout the surrounding Indianapolis area, ING's principal office is located at 8402 Harcourt Road, Suite 601, Indianapolis, Indiana 46260.

26.     The Defendant doctors, who have each practiced medicine at ING at some point during the period relevant to this Complaint, include the following individuals: Mark Bryniarski, M.D. ("Bryniarski"); Michael Burt, M.D. ("Burt"); Patrick J. Connolly, M.D. ("Connolly"); Daniel Cooper, M.D. ("Cooper"); Andrew Denardo, M.D. ("Denardo"); Henry Feuer, M.D. ("Feuer"); Peter Gianaris, M.D. ("Gianaris"); Julius Goodman, M.D. ("Goodman"); David Hall, M.D. ("Hall"); Terry Horner, M.D. ("Horner"); Steven James, M.D. ("James"); Dean Karahalios, M.D. ("Karahalios"); Saad Khairi, M.D. ("Khairi"); Thomas Leipzig, M.D. ("Leipzig"); Armond Levy, M.D. ("Levy"); Nancy Lipson, M.D. ("Lipson"); Kevin Macadaeg, M.D. ("Macadaeg"); Jean-Pierre Mobasser, M.D. ("Mobasser"); Michael Morone, M.D. ("Morone"); Dan Nordman, M.D. ("Nordman"); Troy Payner, M.D. ("Payner"); Eric Potts, M.D. ("Potts"); David Ratzman, M.D. ("Ratzman"); Thomas Reilly, M.D. ("Reilly"); Kenneth Renkens, M.D. ("Renkens"); Carl Sartorius, M.D. ("Sartorius"); Rick Sasso, M.D. ("Sasso"); John Scott, M.D. ("Scott"); Michael Turner, M.D. ("Turner"); Derron Wilson, M.D. ("Wilson"); and Ronald Young, M.D. ("Young") (collectively referred to as "the Doctors"). ING handled a variety of administrative tasks on behalf of the Doctors, including billing for services.

## JURISDICTION

27      The Court has jurisdiction over this matter pursuant to 31 U.S.C §§ 3730(b)(1) and 3732 of the FCA, under 28 U.S.C § 1331 as a federal question and controversy arising under federal law, under 28 U.S.C. § 1345 as an action commenced by the USA, and has supplemental jurisdiction under 28 U.S.C § 1367(a).

28      Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c) and 31 U.S.C § 3732 because Defendant ING does business in this District and because the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## BACKGROUND

29      At all times relevant to this Complaint, the Doctors provided medical care and treatment to patients at ING, specifically the Doctors evaluated and treated the musculoskeletal systems and nervous systems of adults and children. This includes evaluating and treating disorders of the brain, skull, spinal cord, spine, discs, peripheral nerves, and blood vessels related to the nervous system. The Doctors are skilled in performing, among other things, neurosurgery using microscopes and lasers, outpatient spine surgery, transphenoidal pituitary surgery, intra-operative angiography, radiosurgery, CT scans, and brain mapping.

30      At all times relevant to this Complaint, Defendants were providers of services to patients insured by the Federal Insurers.

31.      In submitting claims for reimbursement to the Federal Insurers, providers, including Defendants, utilize Current Procedural Terminology ("CPT") developed by the American Medical Association [4] The CPT coding system was developed to simplify reporting and to identify accurately

---

[4] References to CPT codes in this Complaint are taken from the 2006 Coder's Desk Reference (Lori Becks, Lauri Gray, Nannette Orme eds , Ingenix 11th ed. 2005)(2006) (hereinafter referred to as "CPT Guidelines")

the service provided. Each test consists of a five-digit code used to report medical services and procedures performed by physicians to payers including the Federal Insurers.

32    To participate in these federally funded programs and to claim payment and/or reimbursement for services provided, providers submit CMS Form 1500 to the Federal Insurers, which states in pertinent part:

SIGNATURE OF PHYSICIAN OR SUPPLIER

(I certify that the statements on the reverse apply to this bill and are made a part thereof.)

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

SIGNATURE OF PHYSICAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

.. I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

.. For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills

MEDICAID PAYMENTS (PROVIDER CERTIFICATION)
I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept of Health and Human Services may request. I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under

10

that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

33.     In other words, as a condition to receiving payment and/or reimbursement from the Federal Insurers for claims submitted, providers, including the Defendants, are required to certify that, among other things, the CPT code utilized for reimbursement purposes is justified by the services rendered in accordance with the CPT Guidelines and Medicaid and Medicare reimbursement regulations

34.     The Relators allege that Defendants' practices resulted in false claims being submitted to the Federal Insurers.

35.     At all times relevant to this Complaint, it was a violation of federal and/or state law to submit, or cause to be submitted, a false or fraudulent claim for payment or approval by a government health insurance program

36     At all times relevant to this complaint, it was a violation of federal and/or state law to make, use, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by a government health insurance program

## THE LAW

37.     The FCA, among other things, provides that any person who knowingly submits a false or fraudulent claim to the government for payment or approval is liable for a civil penalty of up

11

to $11,000 for each such claim, plus three times the amount of the damages sustained by the government. The FCA empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and to share in any recovery. The complaint must be filed under seal for 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the action.

38      The FCA states, in pertinent part:

> (a) any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;    or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

> ***

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. [5]

> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

31 U.S.C. § 3729.

39      Likewise, the Indiana FCA, which in essence mirrors the federal version, provides that any person who knowingly presents a false claim to the state for payment or approval is liable

---

[5] False claims submitted after September 29, 1999 incur a penalty of between $5,500 and $11,000 per claim. 28 C.F.R. § 85.3.

for a civil penalty of at least $5,000 and for up to three (3) times the amount of damages sustained

by the state

      40.     The Indiana FCA states, in pertinent part:

      (b) A person who knowingly or intentionally:

      (1) presents a false claim to the state for payment or approval;

      (2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

      (3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

      (4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

      (5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

      (6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

      (7) conspires with another person to perform an act described in subdivisions (1) through (6); or

      (8) causes or induces another person to perform an act described in subdivisions (1) through (6);

      is, except as provided in subsection (c), liable to the state for a civil penalty of at least five thousand dollars ($5,000) and for up to three (3) times the amount of damages sustained by the state. In addition, a person who violates this section is liable to the state for the costs of a civil action brought to recover a penalty or damages

Ind. Code § 5-11-5.5-2.

13

## SPECIFIC ALLEGATIONS OF FRAUD

### Evaluation and Management Services "Upcoding" Scheme

41     At all times relevant to this Complaint, Defendants filed false claims for payment by knowingly and systematically billing for Evaluation and Management ("E&M") services performed by the Doctors on behalf of patients utilizing CPT codes that were not justified under the CPT Guidelines by the services that had actually been provided   The scheme resulted in the Federal Insurers paying significantly more for each E&M service billed.

42     The amount paid for such services depends on the CPT code assigned by Defendants for the services performed. The CPT coding system provides for the assignment of different codes by physicians depending on the type and level of E&M services provided   Different ranges of codes are available for new patient office visits, established patients, outpatient consults, inpatient consults, and other types of E&M services.

43.     There are generally five different levels that can be assigned for such services   Reimbursement increases from low to high within each range   The appropriate E&M code depends primarily on the following key factors: the medical history taken, the physical examination performed, and the complexity of the medical decision-making   Under CPT Guidelines and depending upon the type of service rendered, a level 4 or 5 may be billed only if the encounter involves a presenting problem of moderate to high severity and the physician spends a significant amount of face-to-face time with the patient and/or family.  For example, to properly bill a level 4 or 5 outpatient consultation, the CPT Guidelines require that the physician spend approximately 60 to 80 minutes of face-to-face time with the patient and/or family

44.     The following represents the categories of E&M services with the corresponding CPT codes and 2006 Medicare reimbursement rates:

**New Patient:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99201 | $34.37 |
| 99202 | $61.30 |
| 99203 | $91.07 |
| 99204 | $129.28 |
| 99205 | $164.78 |

**Established Patient:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99211 | $20.00 |
| 99212 | $36.09. |
| 99213 | $49.58 |
| 99214 | $77.88 |
| 99215 | $113.72 |

**Initial Hospital Care:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99221 | $65.12 |
| 99222 | $108.16 |
| 99223 | $150.83 |

**Subsequent Hospital Care:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99231 | $32.65 |
| 99232 | $53.54 |
| 99233 | $76.07 |

**Outpatient Consultations:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99241 | $47.06 |
| 99242 | $86.25. |
| 99243 | $115.06 |
| 99244 | $163.25 |
| 99245 | $211.36 |

**Initial Patient Consultations:**

| CPT Code | Medicare Reimbursement Rate |
|----------|------------------------------|
| 99251 | $34.08 |
| 99252 | $68.68. |
| 99253 | $94.14 |
| 99254 | $135.85 |
| 99255 | $187.27 |

45.    In the instant case, the Defendants knowingly and systematically assigned CPT codes that were not justified under the CPT Guidelines by the services that had actually been provided. Thus, Defendants collected higher payments for their E&M services than they were entitled to receive.

46    In many instances, Defendants "upcoded" their services within the range applicable to the type of service rendered. For example, a new patient office visit that only merited a level 99202 E&M code would be charged as a higher level 99204 or 99205, thereby increasing the Defendants overall reimbursement from $61.30 for 99202 to $129.28 for 99204 or $164.78 for 99205

47.    Defendants' intentional "upcoding" for the purpose of defrauding the Federal Insurers and maximizing overall reimbursement dollars is particularly apparent in the context of inpatient consults. For the years 2004-2006, ING billed a disproportionately high number of level 4 (99254) encounters compared to the relatively low number of level 1 (99251) and 2 (99252) encounters. The following charts for 2004, 2005, and 2006 are illustrative:

Inpatient consults for 2004:

| IP Consults | 99251 | 99252 | 99253 | 99254 | 99255 |
|---|---|---|---|---|---|
| Visits | 7 | 67 | 131 | 268 | 68 |
| Dollars | $637.00 | $9,425.00 | $24,284.00 | $71,288.00 | $24,548.00 |



16

Inpatient consults for 2005:

| IP Consults | 99251 | 99252 | 99253 | 99254 | 99255 |
|---|---|---|---|---|---|
| Visits | 2 | 72 | 143 | 316 | 115 |
| Dollars | $182.00 | $10,150.00 | $27,072.00 | $81,396.00 | $40,793.00 |

Inpatient consults for 2006:

| IP Consults | 99251 | 99252 | 99253 | 99254 | 99255 |
|---|---|---|---|---|---|
| Visits | 6 | 72 | 200 | 277 | 78 |
| Dollars | $364.00 | $8,990.00 | $37,248.00 | $71,554.00 | $27,436.00 |

48.    In addition to this general "upcoding," ING also mischaracterized patient services entirely. For example, office visits were frequently coded as high level outpatient consultations, even when CPT Guidelines require that the service be charged as a new patient office visit. For outpatient consults for the years 2004-2006, ING billed approximately $539,799.00 for 2004, 559,612.00 for 2005, and $369,571.00 for 2006 for a total of $1,468,982.00. In stark contrast, for new patient visits for the same years, ING billed only $21,134.00 for 2004, $20,902.00 for 2005, and $11,886.00 for 2006 for a total of $53,992.00.

49.    Moreover, Defendants commonly changed and mischaracterized a patient's status, as reflected by the CPT code assigned for each visit, several times throughout the patient's course of treatment in a manner not supported by the patient's history with Defendants or the treating physician's dictation for the purpose of receiving a higher reimbursement from the Federal Insurers.

50.    One patient's billing records for services rendered within a one year period are illustrative:

- 12/15/05 (first visit) –Billed using CPT code 99203 for "New Patient."
- 7/20/06 (second visit) – Billed using CPT code 99213 for "Established Patient."
- 8/28/06 (third visit) – Billed using CPT code 99202 for "New Patient."
- 9/13/06 (fourth visit) – Billed using CPT code 99213 for "Established Patient."
- 9/22/06 (fifth visit) – Billed using CPT code 99241 for "Outpatient Consultation"

In this example alone, Defendants improperly mischaracterize the same patient as a "new patient" twice in the same year. In addition, the same patient on her fifth visit is billed as an "Outpatient Consultation" despite the fact that Defendants have already identified her as an "Established Patient" on two prior occasions. This one example of "upcoding" for E&M services is part of a larger scheme by Defendants to intentionally mischaracterize services for the purposes of maximizing overall reimbursements from the Federal Insurers.

51.    A cursory review of the ING Doctors' daily schedules is further evidence of this fraudulent scheme. For example, in many cases a single surgeon was scheduled to see thirty (30) patients in one day. For the CPT code and level utilized by Defendants to be correct that surgeon would have to have conducted 30 level 4 or 5 patient encounters a day for a total of thirty (30) hours that day. Such a result is clearly impossible and only further supports the Relators' claim that these services were fraudulently "upcoded" to maximize overall reimbursement from the Federal Insurers.

52.    Moreover, in many cases there was insufficient documentation to support the level of E&M service billed. Under Medicare if a procedure and/or treatment is not supported by the requisite documentation it is considered "not done" and cannot be billed for reimbursement. *See* "Failure to Document Scheme" further detailed in the Complaint *infra.*

53.    This scheme of incorrectly and intentionally "upcoding" for E&M services was committed by the Defendants for their financial gain and benefit with the intent to defraud the Federal Insurers.

54.    Defendants were advised by their own legal counsel on several occasions that the "upcoding" described violated Medicare and Medicaid reimbursement regulations.

55.    Relators Herron and Anderson advised Defendants on multiple occasions that the CPT codes being utilized for E&M services were not justified by the services rendered.

18

56.    Defendants nonetheless continued this scheme of "upcoding" in flagrant disregard of this advice and with the knowledge that such practices were fraudulent and violative of Medicare and Medicaid regulations.

57    As a consequence, Defendants filed approximately 102,586[6] false claims for payment with the Federal Insurers in the approximate amount of $17,854,244.52[7] for E&M services.

**Transcatheter Permanent Occlusion or Embolization Procedures Scheme**

58.    At all times relevant to this Complaint, Defendants including, but not limited to, Doctors Denardo and Scott filed false claims for payment by knowingly and systematically billing for transcatheter permanent occlusion or embolization procedures utilizing CPT codes 61708 and 61710 despite the fact that such codes were not justified under the CPT Guidelines by the services that had actually been provided. The scheme resulted in the Federal Insurers paying significantly more for each transcatheter permanent occlusion or embolization procedure billed.

59    Transcatheter permanent occlusions or embolizations are performed on patients with vascular malformations, tumors, or bleeding aneurysms. The procedure involves puncturing an "access" artery in the patient's groin area with a needle, inserting a guidewire, and feeding it through the artery into the target vessel. Once the guidewire is in place the doctor threads a catheter over the guidewire, positions the catheter accordingly, and administers "clotting" materials so that the bleeding is permanently stopped. The correct CPT code for this procedure is 61624.

60.    Despite the fact that CPT code 61624 accurately describes the procedure being performed, Defendants nonetheless knowingly and improperly utilized the higher paying CPT codes

---

[6] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for E&M services for the past 35 months which total approximately 29,921. A per month average of 854.89 was calculated and then multiplied by 120 months for an estimated 102,586 in total number of claims billed for E&M services over a ten year period.

[7] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for E&M services for the past 35 months which total approximately $5,207,488.00. A per month average of $148,785.37 was calculated and then multiplied by 120 months for an estimated $17,854,244.52 in total charges billed for E&M services over a ten year period.

61708 and 61710    Codes 61708 and 61710, however, describe a completely different procedure. Indeed, both 61708 and 61710 require that an actual craniotomy (i.e. actually making a neck incision and opening the skull) be performed so that the physician can gain access to the aneurysm or vascular malformation and treat it using electrothrombosis, intra-arterial embolization, injection procedure, or a balloon catheter.

61.    In the vast majority of cases, CPT codes 61708 and 61710 were utilized despite the fact that no craniotomy was performed

62    For the years 2004 and 2005 alone, Defendants improperly billed approximately $566,268.00 under CPT codes 61708 and 61710 compared to the approximately $355,284.00 that should have been billed under the correct CPT code, i.e. 61624, resulting in an overcharge to the Federal Insurers in the amount of $210,984.00

63.    This scheme of incorrectly and intentionally "upcoding" for the transcatheter permanent occlusion or embolization procedure was committed by the Defendants with the intent to defraud the Federal Insurers for their financial gain and benefit

64.    Relators Herron and Anderson advised Defendants on multiple occasions that the CPT codes being utilized for the transcatheter permanent occlusion or embolization procedure were not justified by the services rendered   Defendants were audited twice, once in 2002 and once in 2004, and specifically informed that their utilization of CPT code 61708 and 61710 violated CPT Guidelines

65.    On or about this same time, Relators Herron and Anderson also informed Defendants that such violations resulted in an overcharge to the Federal Insurers, which Defendants were obligated to refund under Medicare and Medicaid regulations.

66    Despite these warnings, Defendants continued this scheme of "upcoding" in flagrant disregard of this advice and with the knowledge that such practices were fraudulent and violative of

20

Medicare and Medicaid regulations    Not until 2006, did Defendants alter their practices and begin billing utilizing the correct CPT code 61624.

67.    Nonetheless, Defendants refused to refund the overcharged payments to the Federal Insurers in violation of Medicare and Medicaid regulations

68    As a consequence, over the last nine[8] (9) years, Defendants filed approximately 319[9] false claims for payments with the Federal Insurers in the approximate amount of $2,548,206.00[10] for the transcatheter permanent occlusion or embolization procedure scheme.

**The Baclofen Test Dose Scheme**

69    At all times relevant to this Complaint, Defendants including, but not limited to, Doctor Turner, filed false claims for payment by knowingly and systematically billing for the baclofen test utilizing CPT code 96450 despite the fact that this code was not justified under the CPT Guidelines by the services that had actually been provided.  The scheme resulted in the Federal Insurers paying significantly more for each baclofen test dose procedure billed

70.    Baclofen is a muscle relaxant and an antispastic agent typically used to relieve the muscle spasms, pain, and muscular rigidity associated with conditions such as multiple sclerosis. The baclofen test procedure involves inserting a needle into the lumbar portion of the patient's spine and injecting a solution testing for a therapeutic or diagnostic outcome.  The correct CPT code for this procedure is 62311.

---

[8] Defendants ceased this fraudulent practice beginning in 2006
[9] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for the transcatheter permanent occlusion or embolization procedure billed under the incorrect CPT codes 61708 and 61710 for the years 2004 and 2005, which total 71.  A per year month average of 3 was calculated and then multiplied by 108 months for an estimated 319 in total number of claims billed over a nine (9) year period for transcatheter permanent occlusion or embolization procedures
[10] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for the transcatheter permanent occlusion or embolization procedure billed under the incorrect CPT codes 61708 and 61710 for the years 2004 and 2005, which total $566,268.00.  A per year month average of $23,594.50 was calculated and then multiplied by 108 months for an estimated $2,548,206.00 in total charges billed over a nine (9) year period for transcatheter permanent occlusion or embolization procedures

71    Despite the fact that CPT code 62311 accurately describes the procedure being performed, Defendants nonetheless knowingly and improperly utilized the higher paying CPT code 96450  CPT code 96450 is utilized when a physician administers chemotherapy (not baclofen) by injecting the medication through a catheter placed through the space between the lower back bones.

72.    This scheme of incorrectly and intentionally "upcoding" for the baclofen test dose procedure was done for the financial gain and benefit of ING and the Doctors  Specifically, CPT code 62311 (Baclofen test) pays $229.11 when administered in the office and $80.11 in a hospital setting whereas CPT code 96450 (chemotherapy) pays $298.76 when administered in the office and $103.76 in a hospital setting.

73.    Herron was unable to obtain the report detailing the exact number of claims submitted as well as the total number of dollars billed by Defendants to the Federal Insurers. ING personnel denied Herron's access both to review and/or print this information. Herron, however, has personal knowledge that the relevant report exists, which should be obtainable through the formal discovery process.

**The Stereotactic Radio Frequency Procedure Scheme**

74.    Since on or about 2003, Defendants including, but not limited to, Doctors Payner, Hall, Sartorius, Gianaris, Horner, James, Leipzig, and Mobasser, filed false claims for payment by knowingly and systematically billing for the stereotactic radio frequency procedure utilizing CPT code 61793 despite the fact that this code was not justified under the CPT Guidelines by the services that had actually been provided  The scheme resulted in the Federal Insurers paying significantly more for each stereotactic radio frequency procedure billed

75.    The stereotactic radio frequency procedure, billed under CPT code 61793, is a noninvasive method for locating and removing brain lesions  Employing stereotactic techniques, the brain lesion is located and then "mapped out" using images obtained by CT, MRI, or angiogram.

The coordinates from these images are then used to focus gamma ray or proton beam energy onto the lesion, thereby destroying it. This entire procedure can take up to two to three hours to complete

76.    Prior to performing this procedure, the patient is fitted with a stereotactic head frame. Fitting the patient with this frame does not require an incision of the scalp or drilling into the skull and typically takes approximately five (5) to ten (10) minutes to complete.

77    Fitting the patient with the stereotactic head frame is the only portion of the procedure described in CPT code 61793 that Defendants typically perform

78.    However, at all times relevant to this Complaint, Defendants including, but not limited to, Doctors Payner, Hall, Sartorius, Gianaris, Horner, James, Leipzig, and Mobasser, have billed using CPT code 61793 as if they had performed the entire two to three hour procedure when in fact they were only present for the five minutes needed for fitting the patient with the stereotactic frame.

79.    According to the American Association of Neurological Surgeons ("AANS"), the leading nationally accepted authority on neurosurgical procedures, it is improper to utilize CPT code 61793 if the physician does not perform all portions of the procedure described in the code.

80.    Instead, CPT code 20660, a/k/a the "frame placement code," should be utilized when the physician only fits the patient with the stereotactic frame and the neuroradiologist performs the remainder of the procedure.

81    Upon information and belief, in some instances, the ING doctors are not even fitting the patients with the frame. Instead these aforementioned doctors are issuing standing orders to their respective registered nurses ("RNs") to perform the procedure themselves and then bill utilizing CPT code 61793 as if the doctor had not only performed the fitting but had performed the entire two (2) to three (3) hour procedure

23

82.    This scheme of incorrectly and intentionally billing for the stereotactic radio frequency procedure was done for the financial gain and benefit of Defendants

83.    CPT code 61793 has a significantly higher reimbursement at a rate of $5,600 00 per procedure performed, than the correct code CPT code 20660 at a rate of $577.00 per procedure performed  This difference in reimbursement results in an overcharge of $5,023.00 per procedure billed.

84.    Since ING first began billing for the stereotactic frame procedure in 2003 it has filed approximately 308 claims for payment with the Federal Insurers and billed approximately $1,668,800.00 when the services ING rendered only justified billing approximately $177,716.00 This resulted in an overcharge to the Federal Insurers of approximately $1,491,084 00.

**Billing for Certified Surgical Technicians Scheme**

85.    At all times relevant to this Complaint, Defendants including, but not limited to, Doctors Bryniarski, Burt, Cohen, Connolly, Cooper, Feuer, Gianaris, Goodman, Hall, Horner, James, Karahalios, Khairi, Leipzig, Levy, Mobasser, Morone, Payner, Potts, Reilly, Renkens, Sartorius, Sasso, Turner, and Young filed false claims for payment by knowingly and systematically billing for "assists" at surgeries utilizing CPT codes applicable to only physicians despite the fact that the certified surgical technicians ("CSTs") actually rendered the service.  The scheme resulted in the Federal Insurers paying significantly more for each procedure and/or "assist" billed under the doctor's provider number but performed by a CST

86.    Specifically, ING billed for "assists" performed by employees Suzann Moore, Joe Prucinsky, and Daniel Glover ("ING CSTs") utilizing physician's provider numbers and CPT codes that may only be utilized by a credentialed provider such as a physician, physician assistant, nurse practitioner, or clinical nurse specialist.

87.    Medicare and Medicaid reimbursement rules explicitly prohibit billing for services rendered by a CST.

88.    In some cases, many of the ING doctors had standing instructions for the CST to perform a procedure and then bill as if the procedure had been rendered by the surgeon.

89    This scheme of incorrectly and intentionally billing for procedures performed by the CSTs but billed under the physician's provider number was done for the financial gain and benefit of Defendants.

90    Despite these regulations, for the years 2004 to 2006, ING billed approximately $443,195.00 for work rendered by a CST but billed under a physician's provider number.

91.    As a consequence, over the last ten (10) years, Defendants filed approximately 2,807[11] claims for payment with the Federal Insurers in the approximate amount of $1,611,618.00[12].

**Billing As if the Physician Administered the Service or as if "incident to" billing requirements were satisfied**

92.    At all times relevant to this Complaint, Defendants including, but not limited to, Doctors Bryniarski, Burt, Cohen, Connolly, Cooper, Denardo, Feuer, Gianaris, Goodman, Hall, Horner, James, Karahalios, Khairi, Leipzig, Levy, Mobasser, Morone, Payner, Potts, Reilly, Renkens, Sartorius, Sasso, Scott, Turner, and Young filed false claims for payment by knowingly and systematically billing for services or treatment performed by non-physicians, i.e. PAs, NPs, RNs or manufacturers representatives, utilizing the physician's provider number despite the fact that the non-physician rendered the service and the circumstances did not justify "incident to" billing under Medicare and Medicaid reimbursement regulations. The scheme resulted in the government paying

---

[11] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work rendered by a CST but billed under the physician's provider number for the years 2004-2006 totaling 772. A per month average of 23.39 was calculated and then multiplied by 120 for an estimated 2,807 in total charges billed over a ten (10) year period.

[12] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work rendered by a CST but billed under the physician's provider number for the years 2004-2006 totaling $443,195.00. A per month average of $13,430.15 was calculated and then multiplied by 120 for an estimated $1,611,618.00 in total charges billed over a ten (10) year period.

significantly more for each procedure and/or "incident to" assist improperly billed under the doctor's provider number but performed by a non-physician

93.    Under Medicare and Medicaid reimbursement rules a credentialed, non-physician may bill for her services utilizing either (1) her own provider number or (2) the physician's provider number if "incident to" billing is justified under the circumstances

94.    In order to bill for services rendered "incident to" the following criteria must be met: the services must be an integral, although incidental, part of the physician's personal professional services, and they must be performed under the physician's direct personal supervision    42 C.F.R. §§ 410.26, 410.74(b)(1)-(5)    "Direct personal supervision" means that the physician is physically present in the same office suite and/or immediately available to render assistance if necessary    42 C.F.R. § 410.32(b)(3)(ii).    "Incident to" services pertain only to services in an office and not a hospital setting.  Moreover, if the non-physician performs all parts of the procedure it may not be billed as "incident to." Instead, the service must be billed using the non-physician provider number.

95    Upon information and belief, in thousands of cases for services Defendants billed as "incident to" over the last ten (10) years there was no ING doctor present to provide direct personal supervision nor did the non-physician merely assist in the procedure.  Rather, the non-physician performed the entire procedure independent of a supervising physician's involvement.

96.    In some cases, many of the doctors had standing instructions for their staff, i.e. RNs, NPs, and PAs, to perform the procedure and then bill as if the procedure had been done "incident to."

97.    Moreover, in many cases the documentation did not support the CPT code utilized. Frequently, an RN and not the physician completed the dictation despite the fact that under Medicare and Medicaid reimbursement rules the documentation must be completed, or at a

minimum signed, by the physician whose provider number is being billed for the service or treatment.

98.    Billing under the physician's provider number as "incident to" results in a much higher reimbursement rate of 100% versus the lower rate of 85% that is used if the service is billed using the non-physician's provider number.

99.    Relator Herron does not have access to the reports that detail the exact number of claims submitted as well as the total dollars billed by Defendants for services and/or treatment provided "incident to." Herron, however, has personal knowledge that the relevant report exists in the form of "productivity reports." These reports should be obtainable through the formal discovery process.

100    Another component of this particular fraudulent billing scheme involves the testing and/or reprogramming of previously placed neurostimulator pulse generators. Defendants have used CPT codes applicable to these procedures as if the physician had rendered the service when in fact the manufacturer's representative is the one actually doing the testing and reprogramming. Moreover, in other cases, the Doctors are issuing standing orders to their respective RNs to complete the procedure and then bill utilizing the physician's provider number despite the fact that the RN is rendering the service and "incident to" billing requirements have not been met

101.    For example, in a "Procedure Note" dictated by Dr. Wilson for a services rendered on July 22, 2005, supporting the use of CPT code 95972 (testing and/or reprogramming neurostimulator pulse generators) and for which he billed under his provider number, he states, "Stimulation was then carried out by a representative from ANS . " In other words, Dr. Wilson billed for a procedure he admitted in his supporting documentation was performed by someone else, in this case the manufacturer's representative from ANS  This example is not an aberration, but is

indicative of a larger scheme on the part of Defendants to defraud the Federal Insurers for their own financial gain.

102.    For another example, in an "Office Note" dictated by RN Ember Criswell for services rendered on March 14, 2006, regarding the reprogramming of a Medtronic pump, Ms. Criswell states, "Dr. Turner was in the office to supervise procedure." Significantly, the "Office Note" is not signed by Dr. Turner, meaning that under Medicare and Medicaid reimbursement regulations there is insufficient documentation to support this claim for reimbursement. Moreover, upon information and belief, Plaintiffs allege that Defendants billed for the procedure utilizing Dr. Turner's provider number despite the fact that Ember Criswell performed the entire procedure under standing orders to do so from Dr. Turner. In addition, the patient who Ms. Criswell refers to in her "Office Note" is not even on Dr. Turner's office schedule for this date of service, further corroborating Plaintiffs' allegations of fraud.

103.    Relator Anderson specifically informed Defendants in a memo dated January 28, 2005 that Medicare and Medicaid reimbursement rules prohibited billing for work rendered by the manufacturer's representative.

104.    Despite this warning that such acts violated Medicare and Medicaid reimbursement rules, ING nonetheless billed approximately $62,187.00 from April 2003 through September 2006 for work rendered by a manufacturer's representative but billed under the physician's provider number.

105.    As a consequence, over the last ten (10) years Defendants filed approximately 691[13] claims for payments with the Federal Insurers and billed approximately $182,011.20[14] for 236

---

[13] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work rendered by a manufacturer's representative but billed under the physician's provider number for the past 41 months totaling 236. A per month average of 5.76 was calculated and then multiplied by 120 for an estimated 691.20 in total claims billed over a ten (10) year period.

procedures rendered by a manufacturer's representative but billed under the physician's provider number

106. Another example of this particular fraudulent billing scheme involves CPT codes 93886 and 93888 These codes are utilized to describe a procedure whereby the physician performs a Doppler ultrasound scan of the extracranial arteries in the head and neck to evaluate the blood flow in relation to the blockage Upon information and belief, ING is billing utilizing CPT codes 93886 and 93888 as if the physician had rendered the service when in fact an x-ray technician is the one actually performing the procedure and returning the results to the billing physician.

107. ING billed approximately $117,621 00 for the years 2004-2006 for 410 procedures rendered by an x-ray technician but billed under the physician's provider number.

108. As a consequence, over the last ten (10) years Defendants filed approximately 1,490[15] claims for payments with the Federal Insurers and billed approximately $427,712.40[16] for work rendered by an x-ray technician but billed under the physician's provider number.

109. Therefore, for this particular fraudulent scheme over the last ten (10) years, Defendants filed approximately 2,181 claims with the Federal Insurers and billed approximately $609,723 60 for work rendered by a manufacturer's representative or x-ray technician but billed under the physician's provider number. Upon information and belief this total is actually much

[14] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work rendered by a manufacturer's representative but billed under the physician's provider number for the past 41 months totaling $62,187.00 A per month average of $1,516 76 was calculated and then multiplied by 120 for an estimated $182,011 20 in total charges billed over a ten (10) year period

[15] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work rendered by an x-ray technician but billed under the physician's provider number for the past 33 months totaling 410 A per month average of 12 42 was calculated and then multiplied by 120 for an estimated 1,490 in total claims billed over a ten (10) year period

[16] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work rendered by an x-ray technician but billed under the physician's provider number for the past 33 months totaling $117,621 00. A per month average of $3,564 27 was calculated and then multiplied by 120 for an estimated $427,712 40 in total charges billed over a ten (10) year period

higher as the total number of claims filed and dollars billed to the Federal Insurers for those services fraudulently submitted as "incident to" are not readily ascertainable by Relator Herron.

**Billing for Non-Credentialed Providers Scheme**

110    At all times relevant to this Complaint, Defendants including, but not limited to, Doctors Bryniarski, Burt, Cohen, Connolly, Cooper, Feuer, Gianaris, Goodman, Hall, Horner, James, Karahalios, Khairi, Leipzig, Levy, Mobasser, Morone, Payner, Potts, Reilly, Renkens, Sartorius, Sasso, Turner, and Young filed false claims for payment by knowingly and systematically billing for non-credentialed providers, i.e. PAs and NPs, prior to credentialization. The scheme resulted in the government paying significantly more for each procedure billed for these non-credentialed providers.

111    Medicare and Medicaid reimburse for services rendered by a PA or NP but only if the PA or NP has certain credentials. 42 C.F.R. §§ 410.74(a) & 410.75(a). Those credentials include that the PA or NP be licensed by the state in which she is performing the services, that she have graduated from an accredited program, and that she have passed a national certification examination administered by the National Commission on Certification.

112    Upon information and belief, ING submitted claims for reimbursement to Medicare and Medicaid for non-credentialed providers prior to their credentialization.

113    In addition, in some cases many of the doctors had standing instructions for a PA or NP to perform a procedure and then bill as if the procedure had been done incident to or by the surgeon himself.

114    For the past 33 months, ING billed approximately $1,713,645.00 for 2,885 procedures rendered by a non-credentialed provider.

115    As a consequence, over the last ten (10) years Defendants filed approximately 10,490.40[17] claims for payments with the Federal Insurers and billed approximately $6,231,436.80[18] for work rendered by a non-credentialed provider.

**Billing for Students, Residents and Fellows**

116.    At all times relevant to this Complaint, Defendants including, but not limited to, those Doctors that engage in rounds at Methodist Hospital and St. Vincent Hospital, filed false claims for payment by knowingly and systematically billing for services rendered by students, residents, and fellows utilizing the physician's provider number despite the fact that the Federal Insurers already reimburse the educational institutions for services rendered by these same individuals. The scheme resulted in the Federal Insurers paying twice for each procedure billed under the physician's provider number but performed by a student, resident or fellow.

117.    Under Medicare and Medicaid reimbursement regulations, approved teaching hospitals receive reimbursement for services and/or treatment provided by students, residents, and fellows under specific circumstances.

118    Generally a "Teaching Physician," defined as a "physician (other than another resident) who involves residents in the care of his or her patients," may also receive reimbursement under Medicare and Medicaid reimbursement regulations if either (1) the teaching physician performs the entire procedure himself, or (2) he is present during the key portion of any service or procedure for which payment is sought. 42 C.F.R. § 415.152 & 415.172(a).

---

[17] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work rendered by a non-credentialed provider prior to credentialization for the years 2004-2006 totaling 2,885. A per month average of 87.42 was calculated and then multiplied by 120 for an estimated 10,490.88 in total claims billed over a ten (10) year period.

[18] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work rendered by a non-credentialed provider prior to credentialization for the years 2004-2006 totaling $1,713,645.00. A per month average of $51,928.64 was calculated and then multiplied by 120 for an estimated $6,231,436.80 in total charges billed over a ten (10) year period.

119.    Upon information and belief, Defendants are not "present during the key portion of" the service or procedure for which they are seeking reimbursement. Moreover, they are issuing standing orders for the student, resident or fellow to perform the entire procedure and then bill for the procedure utilizing the physician's provider number.

120    As a consequence, over the last ten (10) years Defendants have filed false claims for payments with the Federal Insurers and received millions of dollars in improper reimbursements that they would not otherwise have been entitled to receive.[19]

**Failure to Document Scheme**

121.    At all times relevant to this Complaint, Defendants filed false claims for payment by knowingly and systematically billing for services and medical treatment despite the fact that there was no medical documentation supporting the rendering of any services on the date of the charge or justified by the CPT code utilized. The scheme resulted in the Federal Insurers paying significantly more for each procedure billed which had no supporting dictation.

122    Under Medicare if a procedure and/or treatment is not supported by the proper documentation it is considered "not done" and cannot be billed for reimbursement. Specifically, 42 U.S.C. 1395l(e) states in pertinent part: "No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period."

123.    Despite this clear statutory mandate, Defendants frequently billed for treatment and/or procedures that was not supported by adequate documentation from the treating physician.

---

[19] Relator Herron does not have access to the reports that detail the exact number of claims submitted as well as the total dollars billed by Defendants for services and/or treatment provided by students, residents and fellows but billed under the physician's provider number. Herron, however, has personal knowledge that the relevant report exists, which should be obtainable through the formal discovery process.

124.    One example of a CPT code that was frequently billed by Defendants but that was rarely, if ever, supported by supporting documentation is CPT code 61107  CPT code 61107 is used to describe a procedure whereby the physician drills a hole in the patient's skull for the purpose of implanting a ventricular catheter to facilitate drainage or a pressure recording device to determine the amount of excess fluid.

125.    On one occasion Relator Anderson informed Dr. Payner of the need to provide documentation for procedures performed on patient Janet Baker on or about December 2, 2004, that Dr. Payner had billed under CPT code 61107. Despite this information, Dr. Payner refused to dictate the required documentation and responded in a note to Anderson: "never dictated 61107 in 10 ½ years."

126    For the past 33 months, ING billed approximately $1,455,132.00 for CPT code 61107 for a total of approximately 912 procedures   Under Medicare and Medicaid reimbursement rules, this procedure needs to be supported by dictation completed by the physician rendering the service. However, upon information and belief, Defendants do not possess the requisite supporting documentation.

127.    As a consequence, over the last ten (10) years Defendants filed approximately 3,316.80[20] claims for payments with the Federal Insurers and billed approximately $5,291,389.20[21] for CPT code 61107 despite the fact that Defendants do not possess the requisite supporting documentation.

---

[20] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work billed under CPT code 61107 without adequate documentation for the past 33 months totaling 912  A per month average of 27.64 was calculated and then multiplied by 120 for an estimated 3,316.8 in total claims billed over a ten (10) year period.
[21] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work billed under CPT code 61107 without adequate documentation for the years 2004-2006 totaling $1,455,132.00  A per year average of $44,094.91 was calculated and then multiplied by 120 for an estimated $5,291,389.20 in total charges billed over a ten (10) year period

128    Another example of Defendants failure to maintain supporting documentation is their use of CPT code 61070. This code is used to describe a procedure whereby a physician injects or aspirates a shunt tubing or reservoir with a needle to check to make sure the shunt is providing the proper drainage.

129    For the past 33 months, ING billed approximately $168,270.00 for CPT code 61070 for a total of approximately 433 procedures despite the fact that Defendants do not possess the requisite supporting documentation.

130.    As a consequence, Defendants filed approximately 1,574[22] claims for payments with the Federal Insurers and billed approximately $611,890.80[23] for CPT code 61070 despite the lack of adequate supporting documentation and/or dictation.

131    Therefore, for this particular fraudulent scheme over the last ten (10) years, Defendants filed approximately 4,891 claims with the Federal Insurers and billed approximately $5,903,280.00 for CPT codes 61107 and 61070 despite the fact that Defendants do not possess the requisite supporting documentation. Upon information and belief the total number of claims filed and dollars billed to the Federal Insurers for this particular fraudulent scheme is actually much higher as the examples cited above r are only a small sampling of CPT codes billed without the requisite documentation

**Failure to Refund Scheme**

132    At all times relevant to this Complaint, Defendants knowingly failed to refund payments fraudulently received from Medicare and Medicaid and upon discovery of over-billings

---

[22] This figure was extrapolated utilizing ING's total number of claims submitted to Medicare and Medicaid for work billed under CPT code 61070 without adequate documentation for the years 2004-2006 totaling 433. A per month average of 13.12 was calculated and then multiplied by 120 for an estimated 1,574 in total claims billed over a ten (10) year period

[23] This figure was extrapolated utilizing ING total Medicare and Medicaid charges for work billed under CPT code 61070 without adequate documentation for the years 2004-2006 totaling $168,270.00. A per month average of $5,099.09 was calculated and then multiplied by 120 for an estimated $611,890.80 in total charges billed over a ten (10) year period

failed to take corrective actions to prevent future violations. The scheme resulted in Defendants improperly retaining funds in violation of federal and state law.

133.    At all times relevant to this Complaint, Relators Herron and Anderson informed Defendants that the schemes detailed in paragraphs 41-131 of the Complaint *supra* violated Medicare and Medicaid reimbursement rules. In fact, both Relators Herron and Anderson personally warned Defendants through face-to-face interactions, written memorandums and "Coding Updates."

134.    Herron and Anderson also performed audits in 2002 and 2004 both of which revealed numerous coding violations, overcharges, and false billings. Among the physicians whose charts were audited, there were numerous examples of upcoding, failure to document, insufficient documentation, and missing information.

135.    Significantly, Defendants made no changes following the release of the audit results.

136.    The violations reported in the 2002 and 2004 audits were explained in detail to Defendants including ING management and the Doctors.

137.    On or about the same time that the results of the audits were circulated, Relators Herron and Anderson also informed Defendants of their duty to refund any funds improperly received through false claims.

138.    Upon learning that they had violated Medicare and Medicaid reimbursement regulations and received improper reimbursements, Defendants knowingly failed to refund such monies.

139.    Instead, Defendants including, but not limited to ING management, responded by instructing Relators Herron and Anderson to discontinue all internal audits in the future.

140.    All of the information and warnings provided by the Relators were ignored by Defendants, and specifically by ING management.

141    Despite having knowledge of these violations, Defendants continued the same fraudulent practices and/or schemes.

142    As a consequence, Defendants filed false claims for payments with government-funded health insurance programs and improperly retained reimbursements that were fraudulently obtained.

## LEGAL CLAIMS

143.    Counts I, II, III, and IV seek redress and damages under the FCA for false claims made to the USA by Defendants; Counts V, VI, VII, and VIII seek redress and damages under the Indiana FCA for false claims made to the State of Indiana by Defendants; Counts IX and X seek redress and damages, including treble damages, for statutory conversion and statutory theft as defined under Indiana law; Counts XI, XII, and XIII seek redress and damages under common law theories of payment by mistake of fact, fraud, and unjust enrichment; Count XIV seeks an accounting, disgorgement, and the imposition of a constructive trust; and Count XV seeks redress for retaliatory dismissal in violation of federal whistleblower protection provisions.

## COUNT I
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

144.    Plaintiffs/ Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

145    The Defendants have knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Federal Insurers. At the times the Defendants presented or cause to be presented the false or fraudulent claims for payment or approval, they

knew that the claims were false or fraudulent or they acted in deliberate ignorance or reckless disregard thereof

146.    By virtue of the false or fraudulent claims made by the Defendants, the USA has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the FCA, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

## COUNT II
(False Claims Act: Making or Using False Record or Statement)
(31 U S C § 3729(a)(2))

147.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above

148.    The Defendants have knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Federal Insurers   At the times the Defendants made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the Federal Insurers, they knew that the information in them was false or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

149    By virtue of the false records or false statements by the Defendants, the USA has suffered damages, and the Plaintiffs/ Relators therefore are entitled to treble damages under the FCA, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises

## COUNT III
(False Claims Act:  False Record to avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7))

150    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

151    The Defendants have knowingly made, used or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Federal Insurers.  At the times the Defendants made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Federal Insurers, they knew that the information in them was false or they acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

152.    By virtue of the false records or false statements, the USA has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the FCA, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

## COUNT IV
(False Claims Act: Conspiring to Submit False Claims)
(31 U.S.C. § 3729(a)(3))

153    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

154.    The Defendants have agreed and conspired with each other to defraud the USA by getting false or fraudulent claims allowed or paid.  The Defendants did so for the purpose of

obtaining payment from the USA or approved of claims against the USA. The Defendants shared in this conspiratorial objective.

155    By virtue of Defendants' conspiracy to defraud the USA, the USA has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the FCA, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

### COUNT V
(Indiana False Claims Act: Presentation of False Claims)
(Ind. Code § 5-11-5 5-2(1))

156    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

157.    The Defendants have knowingly presented, or caused to be presented false or fraudulent claims for payment or approval to the Federal Insurers that were reimbursed by the State of Indiana. At the times the Defendants presented or cause to be presented the false or fraudulent claims for payment or approval, they knew that the claims were false or fraudulent or they acted in deliberate ignorance or reckless disregard thereof.

158.    By virtue of the false or fraudulent claims made by the Defendants, the State of Indiana has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the Indiana FCA, to be determined at trial, plus a civil penalty of at least $5,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

## COUNT VI
(Indiana False Claims Act:  Making or Using False Record or Statement)
(Ind  Code § 5-11-5.5-2(2))

159.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

160.    The Defendants have knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Federal Insurers which were ultimately reimbursed by the State of Indiana   At the times the Defendants made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the Federal Insurers and to the extent they were reimbursed by the State of Indiana, they knew that the information in them was false or acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

161.    By virtue of the false records or false statements by the Defendants, the State of Indiana has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the Indiana FCA, to be determined at trial, plus a civil penalty of at least $5,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises

## COUNT VII
(Indiana False Claims Act:  False Record to avoid an Obligation to Refund)
(Ind  Code § 5-11-5.5-2(6))

162.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above

163     The Defendants have knowingly made, used or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or

property to the State of Indiana   At the times the Defendants made, used, or caused to be made or used false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Indiana, they knew that the information in them was false or they acted in deliberate ignorance or reckless disregard of the truth or falsity of the information.

164    By virtue of the false records or false statements, the State of Indiana has suffered damages, and the Plaintiffs/Relators therefore are entitled to treble damages under the Indiana FCA, to be determined at trial, plus a civil penalty of at least $5,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

## COUNT VIII
(Indiana False Claims Act: Conspiring to Submit False Claims)
(Ind. Code § 5-11-5.5-2(7))

165.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

166.    The Defendants have agreed and conspired with each other and others to defraud the State of Indiana by getting false or fraudulent claims allowed or paid   The Defendants did so for the purpose of obtaining payment from the USA or approved of claims against the USA   The Defendants shared in this conspiratorial objective.

167.    By virtue of Defendants' conspiracy to defraud the State of Indiana, the State of Indiana has suffered damages, and the Plaintiffs/ Relators therefore are entitled to treble damages under the Indiana FCA, to be determined at trial, plus a civil penalty of at least $5,000 for each violation; for an award of costs of suit and reasonable attorneys' fees incurred in bringing this action; and for such other and further relief as may be just and proper in the premises.

## COUNT IX
### (Conversion)
### (Ind. Code § 35-43-4-3)

168     Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

169     The actions of Defendants, as set forth herein and otherwise, constitute conversion as defined in Ind. Code § 35-43-4-3, and for which Plaintiffs/Relators may recover damages in a civil action, because Defendants knowingly and intentionally exerted unauthorized control over assets and property belonging to the USA and the State of Indiana.

170.    The USA and the State of Indiana continue to be damaged by the actions of Defendants.

171.    The actions of Defendants have been and are willful, wanton, and malicious.

172     By virtue of the Defendants' actions, the USA and the State of Indiana have suffered damages, and the Plaintiffs/Relators are therefore entitled to treble damages under Ind. Code § 34-24-3-1, to be determined at trial, for all available compensatory damages, punitive damages, interest, costs and attorney fees.

## COUNT X
### (Theft)
### (Ind. Code § 35-43-4-2)

173     Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

174     The actions of Defendants, as set forth herein and otherwise, constitute theft as defined in Ind. Code § 35-43-4-2, and for which Plaintiffs/Relators may recover damages in a civil action, because Defendants knowingly or intentionally exerted unauthorized control over the property of the USA and the State of Indiana, with the intent to deprive it of its value or use

42

175.    The USA and the State of Indiana continue to be damaged by the actions of

Defendants.

176.    The actions of Defendants have been and are willful, wanton, and malicious.

177.    By virtue of the Defendants' actions, the USA and the State of Indiana have suffered

damages, and the Plaintiffs/Relators are therefore entitled to treble damages under Ind. Code § 34-

24-3-1, to be determined at trial, for all available compensatory damages, punitive damages, interest,

costs and attorney fees.

## COUNT XI
(Payment Under Mistake of Fact)

178.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations

contained in the paragraphs above.

179.    This is a claim for recovery of monies paid by the USA and the State of Indiana to

the Defendants as a result of mistaken understandings of fact.

180.    The false claims, which Defendants submitted to the USA's and the State of

Indiana's agents, were paid by the USA and the State of Indiana based upon mistaken or erroneous

understandings of material facts.

181.    The USA and the State of Indiana, acting in reasonable reliance on the truthfulness

of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants

certain sums of money to which they were not entitled, and Defendants are thus liable to account

and pay such amounts, which are to be determined at trial, to the USA and the State of Indiana.

182.    By virtue of the Defendants' actions, the USA and the State of Indiana have suffered

damages, and the Plaintiffs/Relators are therefore entitled to recovery of their damages, including all

available compensatory damages, punitive damages, interest, costs, attorney fees, and all other

damages afforded under the operation of any law, in amounts to be determined at trial.

## COUNT XII
(Common Law Fraud)

183.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

184.    Defendants made material and false representations to the USA and the State of Indiana with knowledge of their falsity or reckless disregard for their truth, with the intention that the USA and the State of Indiana act upon the misrepresentations to their detriment.

185.    The USA and the State of Indiana acted in justifiable reliance upon Defendants' misrepresentations by making payments on the false claims

186.    Had the true facts been known to the USA and the State of Indiana, Defendants would not have received the payments on the false claims.

187.    By virtue of the Defendants' actions, the USA and the State of Indiana have suffered damages, and the Plaintiffs/Relators are therefore entitled to recovery of their damages, including all available compensatory damages, punitive damages, interest, costs, attorney fees, and all other damages afforded under the operation of any law, in amounts to be determined at trial.

## COUNT XIII
(Unjust Enrichment)

188.    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

189.    This is a claim for the recovery of monies by which all Defendants have been unjustly enriched

44

190.    By directly or indirectly obtaining government funds to which they were not entitled, Defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, to the USA and the State of Indiana.

191.    By virtue of the Defendants' actions, the USA and the State of Indiana have suffered damages, and the Plaintiffs/Relators are therefore entitled to recovery of their damages, including all available compensatory damages, punitive damages, interest, costs, attorney fees, and all other damages afforded under the operation of any law, in amounts to be determined at trial.

### COUNT XIV
(Disgorgement, Constructive Trust, and Accounting)

192.    Plaintiffs/Relators hereby reallege and incorporates by reference the allegations contained in the paragraphs above.

193.    This is a claim for disgorgement of profits earned by Defendants because of payments made by the USA and the State of Indiana to Defendants pursuant to false claims.

194.    Defendants concealed their activity through false statements, claims, and records, and failed to abide by their duty to disclose such information to the USA and the State of Indiana.

195.    The USA and the State of Indiana did not detect Defendants' illegal conduct

196.    This court has the equitable power to, among other things, order the Defendants to disgorge the entire profit the Defendants earned from business generated as a result of their violations of the FCA and the Indiana FCA.

197    By this claim, the USA and the State of Indiana request a full accounting of all revenues (and interest thereon) and costs incurred by Defendants on payments made pursuant to the false claims, disgorgement of all profits earned and/or the imposition of a constructive trust in favor of the USA and the State of Indiana on those profits

## COUNT XV
(False Claims Act: Retaliation/Whistleblower Protection)
(31 U.S.C. §3730(h) and IC §5-11-5 5-8)

198    Plaintiffs/Relators hereby reallege and incorporate by reference the allegations contained in the paragraphs above.

199    Plaintiff Herron is protected by 31 U.S.C. §3730(h) which states: "Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of his employer or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole."

200.    Plaintiff Herron is (and has been since October 2006) engaged in protected activity, i.e. the investigation and initiation of an action pursuant to the False Claims Act, 31 U.S.C. §3729 *et seq.*

201    Plaintiff Herron suffered adverse action by his employer, the Defendants in this cause, on November 12, 2007 when he was discharged from employment.

202    Plaintiff Herron's assistance in this Qui Tam action is believed to be the reason for his wrongful termination.

203    This type of retaliation by Defendants entitles Plaintiff Herron to all relief necessary to make him whole, which may include reinstatement with seniority, double back pay, interest on back pay, front pay, lost future earnings, damages for emotional distress, attorney's fees, and costs.

### Prayer For Relief

WHEREFORE, Plaintiffs/Relators request that judgment be entered in its favor and against Defendants jointly and severally as follows:

1       On the First, Second, Third, and Fourth Counts under the FCA for the amount of the USA's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper

2.      On the Fifth, Sixth, Seventh, and Eighth Counts under the Indiana FCA for the amount of the State of Indiana's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper

3.      On the Ninth and Tenth Counts, for conversion and theft, for all available compensatory damages, punitive damages, and statutory damages, including treble damages, under Ind. Code § 34-24-3-1, and all available interest, costs and attorneys' fees

4       On the Eleventh and Thirteenth Counts, for payment by mistake and unjust enrichment, for damages sustained and/or amounts by which the Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

5.      On the Twelfth Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

6.      On the Fourteenth Count, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Defendants and such further equitable relief as may be just and proper.

7.    On the Fifteenth Count, for retaliation/whistleblower protection, for front pay and lost future earnings due to animosity between the parties making reinstatement inapplicable, damages for emotional distress, attorney's fees, costs, and such further relief as may be deemed appropriate by this Court

## JURY DEMAND

The Plaintiffs/Relators hereby demand trial by jury

Respectfully submitted,

s/ Mary Jane Lapointe
Mary Jane Lapointe (13706-53)
Lapointe Law Firm PC
1 N. Pennsylvania Street, Suite 730
Indianapolis, IN 46204
Telephone:  317-829-5870


s/ Michael B. McMains
Michael B. McMains (17075-49)
John Lewis and Wilkins LLP
20 North Meridian Street, Suite 400
Indianapolis, Indiana  46204
Telephone:  317-636-7460
Facsimile:  317-636-7505


s/ Thomas A. John
Thomas A. John (18015-49)
John Lewis and Wilkins LLP
20 North Meridian Street, Suite 400
Indianapolis, Indiana  46204
Telephone:  317-636-7460
Facsimile: 317-636-7505


Attorneys for Plaintiffs/Relators

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January, 2008, a copy of the foregoing Amended Complaint for Damages and Demand for Jury Trial was filed electronically. Notice of this filing will be sent to the following parties by first-class U.S. Mail, postage prepaid.

Shelese Woods
Assistant United States Attorney
Southern District of Indiana
10 West Market Street
Suite 1200
Indianapolis, IN 46204

s/ Thomas A. John
Thomas A. John